WEST, ANDRE P. PILLOT, CHESTER S. FAIRGRIEVE, AND
IAM J. BUTLER, TRADING AS C. E. WELLES & CO., v. W. T.
ERFIELD.

(Filed 16 September, 1925.)

**cts—Futures—Wagering Contracts—Parol Evidence—Statutes.**

statutes rendering void and unenforceable in our courts a contract
ie sale of futures upon margin covered by the purchaser, that
ot contemplate the delivery of the thing bargained for, but only a
int to be made for a loss incurred or a profit to be received in
lance with the fall or rise of the market, looks to the substance of
ntract and not to its form, and parol evidence is competent to show
tention of the parties entering therein. C. S., 2144.

**-Evidence—Prima Facie Case—Burden of Proof—Instructions.**

o whether a contract for the sale of shares of stock was intended
parties to be upon speculation, in violation of C. S., 2144, or con-
ited the actual delivery of the shares contracted to be sold, the
ant in the action, the purchaser, makes out a *prima facie* case upon
ce that it was founded upon a gambling or wagering consideration
ation of the statute, C. S., 2145, and thereupon the burden of proof
w to the contrary rests upon the plaintiff, and upon conflicting evi-
becomes a question for the jury under proper instructions from the
C. S., 2146.

**ce—Contracts—Futures—Appeal and Error.**

imony of a witness as to what facts constitute a marginal payment
under the terms of a contract in violation of our statute is unobjection-
able when correctly stating the law.

APPEAL by plaintiffs from *Bond, J.,* and a jury, at March Term,
1925, of CHOWAN.

WELLES & CO. *v.* SATTERFIELD.

This is a civil action brought by plaintiffs, stockbrokers, at 71 Broadway, New York, members of the New York Stock Exchange. On 30 April, 1922, defendant wrote plaintiffs the following letter from Edenton, N. C.:

"I received your letter of 25 April stating that you would recommend International Nickel. Please buy 100 shares of it at market and send me your invoice. I will forward you check for the marginal requirement."

In compliance with the letter, plaintiffs purchased International Nickel (I. K.), 100 shares, from Block, Maloney & Co., 74 Broadway, at 18.75 per share. Defendant, on 11 May, 1922, wrote plaintiffs the following letter:

"I received a letter from you stating you would like to have some money on my account, but you did not state how much. Please advise me at once."

Plaintiffs, on 15 May, 1922, wrote defendant:

"Replying to your letter of 11 May, kindly forward $750 to cover the margin on your account."

On 26 January, 1923, plaintiffs closed out the "International Nickel" at 14.87½ a share, and sued defendant for difference, including commissions and interest—$498.14.

Plaintiffs' evidence was to the effect that they advanced their own funds for the purchase, and that "said stock was immediately delivered to C. E. Welles & Co., and payment therefor made by them through the Stock Clearing Corporation in accordance with the rules of the New York Stock Exchange. . . . That payment for said stock was made by the plaintiffs on 3 May, 1922, and charged to defendant's account. That said stock was immediately delivered to the plaintiffs as defendant's brokers, and that they held said stock as security for defendant's account."

The plaintiffs in their complaint allege that they "made repeated demands upon defendant for the payment of margin on his account, which payment defendant wrongfully failed and neglected to make, whereupon plaintiffs notified the defendant that unless he made payment of margin they would take steps to close out the account and collect from him any loss."

Defendant in his answer says: "The defendant admits the plaintiffs demanded payment of 'margin,' and that the same was refused, this defendant contending he has never entered into a legal contract with the plaintiffs and owes them nothing."

The defendant, for a further answer, says, in part: "That the alleged contract, this defendant is advised and so avers the fact to be, is contrary to public policy and the statute law of the State of North Carolina,

and this defendant pleads C. S., ch. 39, entitled 'Gaming Contracts and Futures,' in bar of plaintiffs' right to recover in this action."

Defendant testified that he was in the insurance business at Edenton and never been engaged in the nickel business. After receiving plaintiffs' circular letter about International Nickel stock, he gave them order as contained in letter.

Plaintiffs in apt time duly excepted and assigned error to the following questions and answers of the defendant:

"Q. Did you expect to get the stock delivered unless you paid for it? A. No, sir. I did not buy the stock to be delivered; I bought it on marginal account. It means hedging the stock. They asked me for $500. Because I did not know whether I was going to get it or not, I would not send it.

"Question by judge: If you had sent them the money for the stock, did you expect them to send the stock to you? A. No. On a marginal basis they could not.

"Question by judge: They have got your order to buy 100 shares. Suppose they had written to you on the date you sent it in, would you expect a delivery of the stock? A. No, sir; I didn't know anything about it. It was a gambling proposition and I would not send check for it. I would not have expected anything from them.

"Q. What is the meaning, so far as this expression of 'marginal' requirements goes? A. It is known as a gambling contract. Stock goes up or down; you get whatever the margin is; you rise up or go down; lose according to the fluctuation of the market."

On recross-examination, defendant said: "Margin is what they call so many points on the stock. If you buy over the purchase price, that is the margin."

"The burden is on the plaintiff to show that it was a legal contract. We have the evidence of only one. Satterfield comes in and files answer claiming it was a gambling contract; that it is upon the plaintiff to show that the contract was not a gambling contract. In other words, that the stock was actually to be delivered up to the defendant, Satterfield. . . . If you accept the other version and find it was a gambling contract, that both parties knew it would not be delivered to Satterfield, in that event your answer shall be 'Nothing.' . . . A gambling bargain is by the purchase of stock by parties knowing that the stock is to be held by them."

To the above charge exceptions and assignments of error were made.

The court below charged the jury further as follows:

"If both parties knew that stock was never to be delivered to Satterfield, then the law says the contract was not a valid contract, and there can be no recovery. If, on the other hand, the stock was bought to be

delivered to Satterfield, and actual delivery was intended, it was a valid contract, or if Satterfield had a right to know the contract existed upon actual delivery, that would make it a valid contract and keep it from being a gambling contract, because a gambling bargain is by the purchase of stock by parties knowing that the stock is to be held by them. . . . The question at issue is: Is Satterfield indebted to plaintiff; if so, in what amount? If you find in favor of plaintiff, C. E. Welles & Co., the amount due is $498.14, with interest on same from 29 January, 1923. If you accept the other version and find it a gambling contract, that both parties knew it would not be delivered to Satterfield, in that event your answer shall be 'Nothing.' "

The issue and answer is as follows:

"Is defendant, Satterfield, indebted to plaintiffs, and, if so, in what amount? A. Nothing."

There was a verdict for the defendant and judgment rendered accordingly. Exceptions and assignments were duly made to evidence and charge, as before stated, and appeal taken to the Supreme Court.

*W. D. Pruden for plaintiffs.*
*Herbert R. Leary for defendant.*

CLARKSON, J. Defendant repudiates his promise made to plaintiffs and sets up the defense "that the alleged contract . . . is contrary to public policy and the statute law of the State of North Carolina, and this defendant pleads C. S., ch. 39, entitled 'Gaming Contracts and Futures,' in bar of plaintiffs' right to recover in this action."

This brings us to consider the statute law on the subject. This is a matter of considerable importance to commercial transactions, and, notwithstanding their length, we give the statutes on the subject:

"C. S., 2144. *Certain contracts as to 'futures' void.* Every contract, whether in writing or not, whereby any person shall agree to sell and deliver any cotton, Indian corn, wheat, rye, oats, tobacco, meal, lard, bacon, salt pork, salt fish, beef, cattle, sugar, coffee, stocks, bonds, and choses in action, at a place and at a time specified and agreed upon therein, to any other person, whether the person to whom such articles is so agreed to be sold and delivered shall be a party to such contract or not, when, in fact, and notwithstanding the terms expressed of such contract, it is not intended by the parties thereto that the articles or things so agreed to be sold and delivered shall be actually delivered, or the value thereof paid, but it is intended and understood by them that money or other thing of value shall be paid to the one party by the other, or a third party, the party to whom such payment of money or other thing of value shall be made to depend, and the amount of such money or other thing of value so to be paid to depend upon

whether the market price or value of the article so agreed to be .sold and delivered is greater or less at the time and place so specified than the price stipulated to be paid and received for the articles so to be sold and delivered, and every contract commonly called 'futures,' as to the several articles and things hereinbefore specified, or any of them, by whatever other name called, and every contract as to the said several articles and things, or any of them, whereby the parties thereto contemplate and intend no real transaction as to the article or thing agreed to be delivered, but only the payment of a sum of money or other thing of value, such payment and the amount thereof and the person to whom the same is to be paid to depend on whether or not the market price or value is greater or less than the price so agreed to be paid for the said article or thing at the time and place specified in such contract, shall be utterly null and void; and no action shall be maintained in any court to enforce any such contract, whether the same was made in or out of the State, or partly in and partly out of this State, and whether made by the parties thereto by themselves or by or through their agents, immediately or mediately; nor shall any party to any such contract, or any agent of any such party, directly or remotely connected with any such contract in any way whatever, have or maintain any action or cause of action on account of any money or other thing of value paid or advanced or hypothecated by him or them in connection with or on account of such contract and agency; nor shall the courts of this State have any jurisdiction to entertain any suit or action brought upon a judgment based upon any such contract. This section shall not be construed so as to apply to any person, firm, corporation, or his or their agent engaged in the business of manufacturing or wholesale merchandising in the purchase or sale of the necessary commodities required in the ordinary course of their business."

"C. S., 2145. *Prima facie evidence of illegal contract in 'futures.'* Proof that anything of value agreed to be sold and delivered was not actually delivered at the time of making the agreement to sell and deliver, and that one of the parties to such agreement deposited or secured, or agreed to deposit or secure, what are commonly called 'margins,' shall constitute *prima facie* evidence of a contract declared void by the preceding section."

"C. S., 2146. *Burden shifted by plea of illegality; pleadings not evidence in criminal action.* When the defendant in any action pending in any court shall allege specifically in his answer that the cause of action alleged in the complaint is in fact founded upon a contract such as is by this chapter made void, and such answer shall be verified, then the burden shall be upon the plaintiff in such action to prove by the proper evidence, other than any written evidence thereof, that the contract sued

upon is a lawful one in its nature and purposes; and the defendant may likewise produce evidence to prove the contrary: *Provided, nevertheless,* that any allegation or statement of fact made in any pleading in any such action, or the evidence produced on the trial in any such action, shall not be evidence against the party making or producing the same in any criminal action against such party."

Plaintiffs' group of assignments of error in regard to the meaning of "marginal requirements," etc., cannot be sustained. It appears from the complaint of plaintiffs, "whereupon plaintiffs notified the defendant that unless he made payment of *margin* they would take steps to close out the account and collect from him any loss," etc.

From the complaint, answer, and letters of both parties, it appears that defendant was to put up "margin." It was clearly permissible for either party to define the meaning. In fact, plaintiffs, on cross-examination, asked defendant the meaning.

Cyc. Law Dictionary, under the head of "margin," says see "gambling contracts," and under such head defines "margin": "Money or collaterals deposited with a broker to protect contracts, usually for future delivery."

The evidence given by defendant in his definition of "margin" could in no way be prejudicial, as it is substantially the definition given by the courts. "A payment made on account by a customer to a stockbroker, under an agreement between the customer and the stockbroker in which the stockbroker agreed either to sell or to buy from the customer a certain number of shares of stock, but under which, in fact, no delivery or transfer of shares was contemplated, is known in stockbrokers' parlance as a 'margin.'" *McClain v. Fleshman* (U. S.), 106 Fed., 880, 882. C. S., 2145, *supra.*

In an action by the purchasers of potatoes by contract providing they should stand any shrinkage while in storage for future delivery, the goods being warranted sound and No. 1 at the time of making the contract, question whether the potatoes were up to specifications, also the meaning of the terms "shrinkage to be stood by the purchaser," held for the jury, the terms being sufficiently ambiguous to permit explanation by parol. *Richardson v. Woodruff,* 178 N. C., 46.

We think the evidence objected to was competent. The charge of the court as to the burden was in accordance with the statute and as to what was and what was not a valid contract, a correct interpretation of the law as plainly written by the lawmaking power of the State. This position is fully sustained by our decisions. *Burns v. Tomlinson,* 147 N. C., 634; *Randolph v. Heath,* 171 N. C., 383.

In *Edgerton v. Edgerton,* 153 N. C., 169, it was said: "The form of the contract is not conclusive in determining its validity when it is

assailed as being founded upon an illegal consideration and as having been made in contravention of public policy. If under the guise of a contract of sale, the real intent of the parties is merely to speculate in the rise or fall of the price and the property is not to be delivered, but only money is to be paid by the party who loses in the venture, it is a gaming contract and void. 'The true test of the validity of a contract for future delivery is whether it can be settled only in money and in no other way, or whether the party selling can tender and compel acceptance of the particular commodity sold or the party buying can compel the delivery of the commodity purchased. The essential inquiry in every case is 'as to the necessary effect of the contract and the real intention of the parties,' " citing 20 Cyc., 930; *Williams v. Carr,* 80 N. C., 295; *S. v. McGinnis,* 138 N. C., 724; *S. v. Clayton, ibid.,* 732.

*Walker, J.,* in *Orvis v. Holt,* 173 N. C., 234, said: "In this case, was it the intention of both parties that the cotton should not be delivered, or was it their purpose to conceal, in the deceptive terms of a fair and lawful contract of sale, a gambling deal or transaction, by which they contemplated no real bargain as to the article agreed to be delivered? If so, the contract is void. *Holt v. Wellons,* 163 N. C., 124. We said in that case: 'Of course, the law deals only with realities and not appearances—the substance and not the shadow. It will not be misled by a mere pretense, but strips a transaction of its artificial disguise in order to reveal its true character. It goes beneath the false and deceitful presentment to discover what the parties actually intended and agreed, knowing that "the knave counterfeits well—a good knave." It always rejects the ostensible for the real in looking for fraud or a violation of law. The essential inquiry, therefore, in every case is as to the necessary effect of the contract and its true purpose.' "

The statute in this State makes contracts for "futures" utterly null and void. The statute clearly defines what are "future" contracts: "Whereby the parties thereto contemplate and intend no real transaction as to the article or thing agreed to be delivered."

The Legislature in its wisdom has seen fit to pass a drastic act to stop this kind of gambling or vicious contracts, no doubt fully aware of the wreckage to the human family. The mischief the act is intended to prevent is plain—that no one should get something for nothing, or nothing for something. The defendant repudiates his promise and relies upon the law—this he has a legal right to do. In fact, the statute makes such transactions, under C. S., 2147, a misdemeanor. Under C. S., 2148, opening offices for sales of "futures" (bucketshop) is also made a misdemeanor. *S. v. McGinnis,* 138 N. C., 724.

On the record we find

No error.